**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

CALCON MUTUAL MORTGAGE LLC, d/b/a ONETRUST HOME LOANS, on behalf of itself and others similarly situated,

Plaintiff,

v.

BROCH LASSIG; RICHARD RUBY; THE CORE TRAINING INC.; RONALD LEONHARDT; and CROSSCOUNTRY MORTGAGE, LLC,

Defendants.

Case No.: 25-cv-02065-H-JAC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT WITH LEAVE TO AMEND**

[Doc. Nos. 27, 33, 34.]

On March 16-24, 2026, Defendants Broch Lassig, Richard Ruby, the Core Training Inc. ("Core"), Ronald Leonhardt, and Crosscountry Mortgage, LLC ("CCM") filed motions to dismiss Plaintiff Calcon Mutual Mortgage LLC doing business as OneTrust Home Loans ("OneTrust")'s second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Doc. Nos. 27, 28, 33.) On May 22, 2026, Plaintiff filed responses in opposition to Defendants' motions to dismiss. (Doc. Nos. 37, 38, 39.) On June 1, 2026, Defendants filed their replies. (Doc. Nos. 42, 43, 44.) On September 9, 2026, the Court took the motions to dismiss under submission. (Doc. No.

48.) For the reasons below, the Court grants in part and denies in part Defendants' motions to dismiss with leave to amend.

## Background

### I. Factual Background

The following factual background is taken from the allegations in Plaintiff's second amended complaint.

#### A. The Parties

Plaintiff is a mortgage lender that employs mortgage loan originators ("MLOs") to guide consumers through the process of applying for and obtaining home loans. (Doc. No. 16, SAC ¶¶ 20–21.) Mortgage lending companies compete for the highest producing MLOs because a top MLO's ability to secure home financing for a consumer is highly sought after. (Id. ¶¶ 22–23.) Plaintiff also employs branch managers, who also often originate loans. (Id. ¶ 24.)

On or around October 16, 2018, Plaintiff hired Defendant Broch Lassig as a producing branch manager. (Doc. No. 16, SAC ¶ 29.) As a branch manager with Plaintiff, Defendant Lassig originated mortgages and managed a small team of MLOs. (Id. ¶ 30.) When Defendant Lassig joined Plaintiff, he signed an employment contract containing a confidentiality agreement. (Id. ¶¶ 31–32.) Under that agreement, Defendant Lassig agreed to keep confidential Plaintiff's "trade secrets, confidential and proprietary information, technology, software, and all other information and data of [Plaintiff] Company that is not generally known to the public or other third parties who could derive economic value from its use or disclosure." (Id. ¶ 33; see id. Ex. B ¶ 2(a), (b).) The provision further defined confidential information to include information and data such as pricing information, cost information, profit or loss figures, and non-public financial information. (Id. ¶¶ 34–36.) On November 21, 2018, Defendant Lassig also signed a joinder agreement binding OTHL Holdings LLC, a Utah company owned and controlled by Defendant Lassig, as a party to Plaintiff's 2018 operating agreement. (Id. ¶ 37.) The 2018 operating agreement defines confidential information to include "profit or loss figures." (Id. ¶ 36; see id. Ex. C.)

On or around June 30, 2020, Defendant Lassig ended his employment with Plaintiff and began working for Defendant CrossCountry Mortgage LLC ("CCM"), a competing mortgage lender. (Doc. No. 16, SAC ¶ 38.) Defendant Ronald Leonhardt is the CEO and President of Defendant CCM (collectively, the "CCM Defendants"). (Id. ¶ 40.) Plaintiff alleges that Defendant Leonhardt "directed, orchestrated, authorized, and ratified the wrongful conduct" of the other defendants. (Id. ¶ 40.) Defendant Leonhardt also hired Defendant Richard Ruby as a branch manager at CCM and negotiated a contract for Defendant Ruby to provide consulting services for CCM. (Id. ¶¶ 41–42.) Defendant Ruby provided these consulting services through his company The Core Training, Inc. ("Core," collectively, the "Core Defendants"), a company that coaches real estate agents and brokers, loan officers, and branch managers. (Id. ¶¶ 44–45.) As of July 2023, Defendant Core coached approximately 100 CCM employees. (Id. ¶ 45.) In his role with Defendant Core, Defendant Ruby also coached Defendant Lassig. (Id. ¶ 47.)

**B. The Utah State Court Action**

From April 2023 to February 2024, Defendants Lassig, Ruby, and Leonhardt gave sworn deposition testimony for a separate lawsuit in Utah state court, CalCon Mutual Mortgage d/b/a OneTrust Home Loans et al. v. Shan Lassig and Broch Lassig, No. 220905431. (Doc. No. 16, SAC ¶¶ 49–52.) On April 24, 2023, Defendant Lassig testified that he sent profit and loss statements to Defendant Ruby and other Core coaches. (Id. ¶ 50.) On July 19, 2023, Defendant Ruby confirmed that Defendant Lassig provided Plaintiff's profit and loss statements to him and other Core coaches. (Id. ¶ 49.) These profit and loss statements included Plaintiff's overhead, expenses, and "other trade secret information." (Id. ¶ 49.) On February 23, 2024, Defendant Leonhardt testified that he would consider CCM's profit and loss statements to be confidential and not to be shared outside of CCM. (Id. ¶ 52.)

Plaintiff states that it first became aware that Defendant Lassig shared confidential profits and loss information with the Core Defendants in July 2025, when the chairman of Plaintiff's board, Joshua Erskine, reviewed Defendant Ruby's deposition transcript in the

Utah state court action. (Doc. No. 16, SAC ¶ 82.) Plaintiff states that it didn't learn of Defendant Leonhardt's comments and threats against Evans until August 2025, when Erskine reviewed Scott Evan's discovery responses. (Id. ¶ 75.)

### C. The Dispute Over Scott Evans

In early 2022, Plaintiff began recruiting Scott Evans, a top-producing MLO who worked for Defendant CCM and was associated with the Core Defendants. (Doc. No. 16, SAC ¶ 59.) On April 21, 2022, Defendant Ruby called Evans and left several voicemails disparaging Plaintiff. (Id. ¶¶ 60–61.) Defendant Ruby left a voicemail stating that "[OneTrust] didn't honor any of their agreement [with Defendant Lassig]," among other statements. (Id. ¶ 64; see id. Ex. A.) From late April to early May, Defendant Leonhardt also made numerous disparaging comments about Plaintiff to Evans, threatening to "decimate" Plaintiff and insisting that Plaintiff was fraudulent. (Id. ¶¶ 66–74; see id. Ex. A.) Evans reported that Defendant CCM called all of Evans' customers and offered them credits to leave Plaintiff. (Id. ¶ 72.) Evan and members of his team joined Plaintiff in May 2022 but returned to CCM in June 2022, allegedly due to Defendants' "coordinated efforts." (Id. ¶ 65.) Defendant Leonhardt admitted that he stayed in "constant contact with [Evans] the entire time" Evans worked for Plaintiff. (Id. ¶ 77.) Defendant Leonhardt also admitted to working with Valerie Costino, a member of Evan's team and an employee of Plaintiff, to close loans for CCM while Evans was working for Plaintiff. (Id.)

Plaintiff alleges that these actions were part of an "unlawful campaign" to attack Plaintiff's reputation and thereby harm its recruiting to the benefit of the Core Defendants. (Doc. No. 16, SAC ¶ 54.) Plaintiff claims that the Core Defendants used Plaintiff's trade secrets to gain competitive advantages and financially enrich themselves. (Id. ¶ 57.) Plaintiff contends that the CCM Defendants caused Evans and other employees of Plaintiff to violate their employment agreements by directing Plaintiff's potential and actual customers to Defendant CCM, inducing Plaintiff's employees to perform mortgage activities for Defendant CCM, causing Evans to solicit Plaintiff's employees to go to Defendant CCM during and after Evans' employment, and inflicting reputational harm on

Plaintiff by orchestrating the departure of Evans and his team. (Id. ¶ 78.) Plaintiff alleges that the CCM Defendants coordinated these actions with the Core Defendants to prevent Plaintiff from engaging in lawful business and MLO recruiting. (Id. ¶ 79.) Plaintiff also alleges that Defendant Ruby and Defendant Leonhardt used, and continue to use, Defendant Lassig's disparaging remarks and illegally obtained trade secrets to spread lies about Plaintiff and its leaders. (Id. ¶ 81.)

## II. Procedural History

On August 11, 2025, Plaintiff filed a complaint against Defendants Lassig, Ruby, and Core. (Doc. No. 1, Compl.) On August 13, 2025, Plaintiff filed a first amended complaint ("FAC") as of right making minor changes to its original complaint. (Doc. No. 6, FAC.) On January 13, 2026, the Court granted Plaintiff's motion for leave to file a second amended complaint ("SAC"). (Doc. No. 15.)

On January 14, 2026, Plaintiff filed its SAC, adding Defendants Leonhardt and CCM to several causes of action and adding additional causes of action against all Defendants. (Doc. No. 16, SAC.) In the second amended complaint, Plaintiff alleges the following claims: (1) breach of contract against Defendant Lassig; (2) misappropriation of trade secrets under the California Uniform Trade Secrets Act ("CUTSA"), California Civil Code § 3426 et seq., against Defendant Lassig; (3) misappropriation of trade secrets under the CUTSA against Defendants Ruby, Core, Leonhardt, and CCM; (4) business disparagement (California trade libel) against Defendants Ruby, Core, Leonhardt, and CCM; (5) defamation per se under North Carolina common law against Defendants Ruby and Core; (6) injurious falsehood/trade libel under North Carolina common law against Defendants Ruby and Core; (7) violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, et seq., against Defendants Ruby and Core; (8) injurious falsehood/trade libel under Ohio common law against Defendants Leonhardt and CCM; (9) defamation per se under Ohio common law against Defendants Leonhardt and CCM; (10) violation of the Ohio Deceptive Trade Practices Act, R.C. § 4165.02(A)(10), against Defendants Leonhardt and CCM; (11) misappropriation of trade secrets under the Defend

Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 et seq., against all Defendants; (12) aiding and abetting misappropriation of trade secrets under the DTSA against all Defendants except Lassig; (13) tortious interference with contract under Ohio common law against Defendants Leonhardt and CCM; (14) tortious interference with business relations under Ohio common law against Defendants Leonhardt and CCM; (15) unfair competition under Lanham Act § 43(a), 15 U.S.C. § 1125(a), against Defendants Leonhardt and CCM; (16) unfair competition under California Business and Professions Code § 17200 et seq., against Defendants Leonhardt and CCM; (17) deceptive trade practices under Ohio Revised Code § 4165.02, against Defendants Leonhardt and CCM; (18) civil conspiracy against all Defendants; and (19) unjust enrichment against all Defendants. (See id. ¶¶ 86–200.) By the present motion, Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all of the claims in Plaintiff's SAC for failure to state a claim. (Doc. No. 27-1 at 1–3, 25; Doc. No. 33-1 at 7–8, 26; Doc. No. 34-1 at 5–6.)

## Discussion

### I. Legal Standards for a Rule 12(b)(6) Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the pleadings and allows a court to dismiss a complaint if the plaintiff has failed to state a claim upon which relief can be granted. See Conservation Force v. Salazar, 646 F.3d 1240, 1241 (9th Cir. 2011) (citing Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001)). Federal Rule of Civil Procedure 8(a)(2) requires that a pleading that states a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The function of this pleading requirement is to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

A complaint will survive a Rule 12(b)(6) motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." Id. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679. Accordingly, dismissal for failure to state a claim is proper where the claim "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008); see Los Angeles Lakers, Inc. v. Fed. Ins. Co., 869 F.3d 795, 800 (9th Cir. 2017).

In reviewing a Rule 12(b)(6) motion to dismiss, a district court must "'accept the factual allegations of the complaint as true and construe them in the light most favorable to the plaintiff.'" Los Angeles Lakers, 869 F.3d at 800 (quoting AE ex rel. Hernandez v. Cty. of Tulare, 666 F.3d 631, 636 (9th Cir. 2012)). But a court need not accept "legal conclusions" as true. Iqbal, 556 U.S. at 678. "Further, it is improper for a court to assume the claimant "can prove facts which it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 526 (1983).

In addition, a court may consider documents incorporated into the complaint by reference and items that are proper subjects of judicial notice. See Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010). If the court dismisses a complaint for failure to state a claim, it must then determine whether to grant leave to amend. See Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995); Telesaurus VPC, LLC v. Power, 623 F.3d 998, 1003 (9th Cir. 2010).

## II. Choice of Law re: Defendant Lassig

As a preliminary matter, Defendant Lassig argues that each claim brought against him under California law must be dismissed because none of them are independent from his alleged breach of his employment agreement with Plaintiff that contains a choice of law provision electing Utah law. (Doc. No. 33-1 at 10–11; Doc. No. 42 at 2–4.) In

response, Plaintiff argues that the choice of law provision governs only its claim for breach of contract, and it does not reach the other "non-contract" claims it asserts against Defendant Lassig. (Doc. No. 37 at 4–6.) Because this choice of law dispute impacts the Court's analysis for multiple claims, the Court addresses it first before evaluating the sufficiency of Plaintiff's various claims.

A. The Choice of Law Provision in Defendant Lassig's Employment Agreement Does Not Extend to Claims 2, 18, and 19

The choice of law provision in Lassig's employment agreement states: "This Contract shall be governed and interpreted according to the laws of the State of Employee's assigned office." (Doc. No. 16-2 at § 13.) "California, the forum state, ordinarily examines the scope of a choice-of-law provision in a contract under the law designated in that contract." Narayan v. EGL, Inc., 616 F.3d 895, 898 (9th Cir. 2010) (citing Wash. Mut. Bank, FA v. Super. Ct., 24 Cal. 4th 906, 1078 n.3 (2001)). In the SAC, Plaintiff alleges that Lassig's assigned office was in Salt Lake City, Utah. (Doc. No. 16, SAC ¶ 29.) Accordingly, this Court applies Utah law to determine the scope of the choice of law provision in Plaintiff's and Lassig's contract.

Utah courts begin with the agreement's plain language. See Brady v. Park, 445 P.3d 395, 407 (Utah 2019). If the language is unambiguous, its plain meaning controls. Id. Here, the language of the choice of law provision in the contract is unambiguous. According to its terms, Utah law controls how the employment agreement is "governed and interpreted." (Doc. No. 16-2 at § 13.) Based on this language, the parties clearly intended for Utah law to apply to issues of contractual interpretation. As such, Utah law applies to Plaintiff's claim for breach of contract against Defendant Lassig.[1]

The Court must now address whether the choice of law provision applies more

---

[1] The parties do not contest that Utah law applies to Plaintiffs' first cause of action for breach of contract against Defendant Lassig, but Lassig argues that the claim should be dismissed "to the extent" it is "brought under California law." (See Doc. No. 37 at 6–7; Doc. No. 42 at 2.) This argument is addressed below. See infra.

broadly, such that Plaintiff's claims against Defendant Lassig for trade secret misappropriation, civil conspiracy, and unjust enrichment must be brought under Utah law. Again, the Court starts with the choice of law provision's text. See Brady, 445 P.3d at 407. Here, the text of the choice of law provision is narrowly drawn. It states only that the agreement "shall be governed and interpreted" according to Utah law. Utah courts interpret choice of law provisions such as this one as applying "only to issues of contractual interpretation." See Roberts v. C. R. England, Inc., 318 F.R.D. 457, 492 (D. Utah 2017) (finding, where agreement stated that it "shall be interpreted under" Utah law, that the agreement did "not reflect the parties' intent to apply Utah law to legal issues beyond contract interpretation").

Defendant Lassig argues that the choice of law provision should nonetheless extend to Plaintiff's claims for trade secret, civil conspiracy, and unjust enrichment because those claims are each "a repackaging of the same base allegation" of Plaintiff's breach of contract claim. (Doc. No. 42 at 3.) If the choice of law provision were drafted more broadly, Defendant Lassig's argument might have merit. See Brigham Young Univ. v. Pfizer, Inc., No. 2:06-CV-890 TS, 2012 WL 918744, at *2 (D. Utah Mar. 16, 2012). In Brigham Young, the district court found that a choice of law provision covering the "validity, interpretation and performance of [the] Agreement and any dispute connected herewith" applied to certain fiduciary, attorney client, and joint venture claims that "rest[ed] heavily" on the duties imposed by the underlying agreement, and in so holding, distinguished that case from other cases interpreting choice of law provisions that were more narrowly drafted. See id. at *1–2; cf. Energy Claims Ltd. v. Catalyst Inv. Group Ltd., 325 P.3d 70, 82 (Utah 2014) (finding forum selection clause "sufficiently broad" to cover tort claims related to the contract, where clause at issue governed "any dispute, controversy or claim" that is "related to" the parties' contract). Here, the language in the choice of law provision is more like the one at issue in Roberts than the one in BYU. As such, the Court interprets the choice of law provision in the contract between Plaintiff and Defendant Lassig as only applying to issues of contractual interpretation. Accordingly, even if the trade secret, civil

conspiracy, and unjust enrichment claims are "rooted" in Defendant Lassig's alleged breach of the employment agreement, those claims are not covered by the narrowly tailored choice of law provision in the agreement and need not have been brought under Utah law.

**III. Plaintiff's Claim for Breach of Contract Against Defendant Lassig**

In the SAC, Plaintiff alleges against Defendant Lassig a claim for breach of contract. (Doc. No. 16, SAC ¶¶ 86–91.) Defendant Lassig argues that Plaintiff's breach of contract claim should be dismissed "[t]o the extent" it is brought under California law. (Doc. No. 33-1 at 11.) In the SAC, Plaintiff fails to specify which state's law applies to its breach of contract claim. (See Doc. No. 16, SAC ¶¶ 86-91.) In its opposition brief, Plaintiff asserts that Utah law applies to its breach of contract claim. (See Doc. No. 37 at 6–8.) In light of this, the Court dismisses Plaintiff's breach of contract claim with leave to amend, so that Plaintiff can specific the governing law for the claim in an amended complaint. See Stewart v. Kodiak Cakes, LLC, 537 F. Supp. 3d 1103, 1157 (S.D. Cal. 2021) ("Plaintiffs must allege the applicable law to determine whether they plead a sufficient claim."); Moore v. Am. Honda Motor Co., 740 F. Supp. 3d 814, 829 (N.D. Cal. 2024) ("This Court and others in this District have repeatedly held that, due to variances among state laws, failure to allege which state law governs a common law claim is grounds for dismissal.").

Defendant Lassig's other arguments as to the breach of contract claim do not warrant dismissal of the claim. First, Lassig argues that even if the breach of contract claim is brought under Utah law, it fails because the confidentiality provision at the center of his alleged breach constitutes an unreasonable covenant not to compete in violation of Utah's Post-Employment Restrictions Act. (Doc. No. 33-1 at 21–22; Doc. No. 42 at 8–9.) But Utah's Post-Employment Restrictions Act excludes confidentiality agreements from its definition of "non-compete agreements." See Utah Code Ann. § 34-51-102(8)(b)(iii). Further, whether this provision "substantively operates" as an unreasonable non-compete is a fact-based inquiry not properly resolved on a motion to dismiss. An assessment of reasonableness requires consideration of specific facts and circumstances; and, therefore, this argument is better suited for a motion for summary judgment on a more developed

record. See Placencia v. I-Flow Corp., No. CV10-2520-PHX-DGC, 2011 WL 1361562, at *4 (D. Ariz. Apr. 11, 2011) (explaining that a "fact-based question must be resolved at summary judgment or trial, not on a motion to dismiss").

Second, Defendant Lassig argues that Plaintiff's breach of contract claim is preempted by either the California Uniform Trade Secret Act ("CUTSA") or Defend Trade Secrets Act ("DTSA"). (See Doc. No. 33-1 at 22–25.) The CUTSA "does not affect contractual remedies, whether or not based upon misappropriation of a trade secret." Cal. Civ. Code § 3426.7(b)(1); see also Integral Dev. Corp. v. Tolat, 675 F. App'x 700, 704 (9th Cir. 2017). The DTSA provides that it is "not to be construed to preempt or displace any other remedies . . . provided by United States Federal, State, commonwealth, possession, or territory law for the misappropriation of a trade secret." 18 U.S.C. § 1838. As such, the Court rejects Defendant Lassig's preemption argument as to Plaintiff's breach of contract claim. In sum, the Court declines to dismiss Plaintiff's claim for breach of contract.

**IV. Plaintiff's Claims for Trade Secrets Misappropriation**

In the SAC, Plaintiff brings three claims for trade secrets misappropriation: (1) a claim under the CUTSA against Defendant Lassig; (2) a claim under the CUTSA against all Defendants except Lassig; and (3) a claim under the DTSA against all Defendants. (Doc. No. 16, SAC ¶¶ 92–109, 149–155.) "Courts have held that the DTSA and CUTSA share the same pleading requirements for the identification of trade secrets." Alta Devices, Inc. v. LG Elecs., Inc., 343 F. Supp. 3d 868, 880-81 (N.D. Cal. 2018); see InteliClear, LLC v. ETC Glob. Holdings, Inc., 978 F.3d 653, 657 (9th Cir. 2020) ("Courts have analyzed these claims together because the elements are substantially similar."). "To state a claim for trade secret misappropriation under the DTSA and the CUTSA, a plaintiff must allege that: '(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff.'" Alta Devices, 343 F. Supp. 3d at 877 (quoting Space Data Corp. v. X, No. 16-cv-03260-BLF, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017)).

A. Identification of Trade Secrets

Each Defendant argues that Plaintiff has failed to adequately identify a trade secret in the SAC. (See Doc. No. 27-1 at 6–8; Doc. No. 33-1 at 12–17; Doc. No. 34-1 at 8–10; Doc. No. 42 at 5–7; Doc. No. 43 at 2; Doc. No. 44 at 1–2.) "The definition of a 'trade secret' is extremely similar under the DTSA and CUTSA." Genasys Inc. v. Vector Acoustics, LLC, 638 F. Supp. 3d 1135, 1150 (S.D. Cal. 2022). Regardless of statute, "a trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." InteliClear, 978 F.3d at 657; see also Genasys, 638 F. Supp. 3d at 1151.

i. Plaintiff's Identification of the Trade Secret

"To allege a trade secret, a plaintiff must 'describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade[.]'" Genasys, 638 F. Supp. 3d at 1151 (quoting Navigation Holdings, LLC v. Molavi, 445 F. Supp. 3d 69, 75 (N.D. Cal. 2020) (citation omitted)). Conclusory and generalized allegations are not enough, but plaintiffs "need not 'spell out the details of the trade secret'" either. Navigation Holdings, 445 F. Supp. 3d at 75 (quoting Autodesk, Inc. v. ZWCAD Software Co., No. 5:14-CV-01409-EJD, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015)). At the pleading stage, the question is whether the claimed trade secrets are described with sufficient particularity to permit the court and defendants "to ascertain at least the boundaries within which the secret lies." 7EDU Impact Academy Inc. v. You, 760 F. Supp. 3d 981, 996 (N.D. Cal. 2024) (quoting Alta Devices, 343 F. Supp. 3d at 881); see also Beluca Ventures LLC v. Einride Aktiebolag, 660 F. Supp. 3d 898, 909 (N.D. Cal. 2023) ("[T]he basic test is: (1) whether something beyond general knowledge is being claimed and (2) whether there is enough specificity to put the defendant on notice regarding the nature of the trade secret.").

To pass muster, a complaint must "clearly refer to tangible trade secret material" rather than referring to information "which potentially qualifies for trade secret protection." InteliClear, 978 F.3d 653 at 658. "'Vague references to an enormous array of potential

sources do not suffice to survive' a motion to dismiss when the court cannot 'determine where trade secret protection begins and ends as to any of this material.'" Luminate Home Loans, Inc. v. Better Mortg. Co., No. 24-CV-2251-BAS-MSB, 2025 WL 3265817, at *3 (S.D. Cal. Nov. 21, 2025) (quoting Synopsys, Inc. v. ATopTech, Inc., No. C 13-CV-02965 SC, 2013 WL 5770542, at *6 (N.D. Cal. Oct. 24, 2013). As a result, allegations resting on "broad, categorical terms, more descriptive of the types of information that generally may qualify as protectable trade secrets than as any kind of listing of particular trade secrets" are generally insufficient. Vendavo, Inc. v. Price f(x) AG, No. 17-CV-06930-RS, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018). Importantly though, general descriptions of subject matter may "become sufficiently particularized for purposes of stating a claim where the complaint alleges that these categories of information are contained within specific documents." Beluca, 660 F. Supp. 3d at 908; see also Cisco Sys., Inc. v. Chung, 462 F. Supp. 3d 1024, 1049 (N.D. Cal. 2020) (finding generalized descriptions of trade secrets—i.e., "market and strategy data," "product strategies and other financial data," and "business information"—sufficient where plaintiff "narrowed the scope of information at issue in such categories to particular subjects mentioned in certain documents or communications alleged in the FAC").

Here, Plaintiff identifies one specific document, its branch profits and loss statements, and eight specific types of information contained therein.[2] Specifically, Plaintiff pleads that profits and loss statements contain information from the following "highly confidential" categories: "(a) the transparent disclosure of corporate allocations and expenses to the branch—an uncommon practice in the mortgage industry; (b) the

---

[2] In their motion, Defendants CCM and Leonhardt delineate and attack two categories of alleged trade secrets, business and technical. (See Doc. No. 27 at 6–8.) Plaintiff does not address its technical trade secrets allegations in its opposition brief and focuses instead on its allegations regarding the profits and loss statements. (See generally Doc. No. 39.) The Court need not address this additional category of alleged technical trade secrets here. Plaintiff's "burden is only to identify at least one trade secret with sufficient particularity to create a triable issue." InteliClear, 978 F.3d 653 at 659.

amounts paid to vendors and other third-party service providers; (c) OneTrust's corporate target yield; (d) margins applicable to particular regions that impact loan pricing; (e) actual closed loan volume; (f) loan product mix by percentage; (g) loan fees; and (h) net income figures." (Doc. No. 16, SAC ¶ 27.) Each Defendant contends that these allegations do not identify trade secrets with adequate particularity because rather than specify the actual information claimed to be secret, Plaintiff merely references vague categories of potentially confidential information. (See Doc. No. 27-1 at 6–8; Doc. No. 33-1 at 14–16; Doc. No. 34-1 at 8–10.) Defendants argue that, as a result, they are not on notice as to the trade secrets they are alleged to have misappropriated. (See id.)

Plaintiff's allegations are sufficient to adequately allege trade secrets with sufficient particularity. Construing the facts in favor of Plaintiff, the information alleged to be in the profits and loss statements is not generally known by others in the trade. Other mortgage lenders are unlikely to know Plaintiff's specific business expenses, financial models, and loan information. Plaintiff specifically alleged that "transparent disclosure" of corporate allocations and expenses to the branch is "an uncommon practice in the mortgage industry." (Doc. No. 16, SAC ¶ 27.) Defendants CCM and Leonhardt argue that the "amounts paid to vendors and other third-party service providers" are not secret. (Doc. No. 27 at 7.) But as the district court explained in Luminate, "an arrangement of publicly available information . . . may still be subject to trade secret protection if that arrangement would save competitors time and effort to locate it." 2025 WL 3265817, at *4; see also Pyro Spectaculars N., Inc. v. Souza, 861 F. Supp. 2d 1079, 1089 (E.D. Cal. 2012) (explaining that where certain publicly available information like customer, operator, and vendor information is compiled and made available to competitor, the compilation "may be entitled to trade secret protection"). Additionally, where, as here, Plaintiff has narrowed the scope of the information at issue to the four corners of a specific document, Defendants cannot plausibly argue they are not sufficiently on notice of the trade secrets they are alleged to have misappropriated. See Beluca, 660 F. Supp. 3d at 908; Cisco, 462 F. Supp. 3d at 1049.

The Court concludes that the SAC describes the trade secrets with sufficient particularity "to permit [Defendants] to ascertain at least the boundaries within which the secret lies." 7EDU Impact Academy, 760 F. Supp. 3d at 996. Further challenges to the scope of the alleged trade secrets may be raised at a later stage in the proceedings.

ii. Independent Economic Value and Reasonable Measures to Protect Secrecy

To qualify as a trade secret under state and federal law, the information must "derive[] independent economic value" from not being known or "readily ascertainable," and "the owner thereof [must have] taken reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A-B); see also Cal. Civ. Code § 3426.1(d)(1-2). The standard to show that trade secrets derive economic value is not high. Calendar Rsch. LLC v. StubHub, Inc., No. 2:17-CV-04062-SVW-SS, 2017 WL 10378336, at *4 (C.D. Cal. Aug. 16, 2017). "'[C]ircumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access' all can sufficiently meet the low standard to show trade secrets derive economic value." Genasys, 638 F. Supp. 3d at 1151 (quoting Calendar Rsch., 2017 WL 10378336, at *3).

Defendants argue that Plaintiff fails to allege how its profits and loss statements derive economic value and instead merely restates the legal standard for trade secrets by alleging that it derives value "from not being generally known or readily ascertainable . . . and protected from disclosure to other mortgage professionals who have not contractually agreed to maintain its confidentiality." (Doc. No. 33-1 at 16.) Similarly, Defendants argue Plaintiff makes only "conclusory allegations" regarding its efforts to preserve secrecy. (Id. at 17.) The Court disagrees.

The SAC explains that access to the relevant information was restricted to employees who had signed confidentiality agreements and that Plaintiff further guarded against unauthorized disclosure of the information through its IT systems and employee training. (Doc. No. 16, SAC ¶ 95.) These allegations are sufficient to plead reasonable efforts to

maintain secrecy. See InteliClear, 978 F.3d at 660 ("Confidentiality provisions constitute reasonable steps to maintain secrecy."); Luminate, 2025 WL 3265817, at *5 (finding reasonable efforts to maintain secrecy sufficiently pled where plaintiff provided information to employees "under the condition that they refrain from using or disclosing [it] at any time during or after their employment" and used password protected logins for the information). Plaintiff also sufficiently pleads independent economic value. Beyond describing its efforts to preserve secrecy, Plaintiff further explains in the SAC why disclosure would harm its competitive standing. (Doc. No. 16, SAC ¶ 96 ("OneTrust's . . . trade secrets provide Lassig, Ruby, and Core's coaches with a competitive advantage in the market because knowing OneTrust's entire model for how it hires loan officers and branches, allocates corporate costs and expenses, sets margins, structures loan pricing and loan officer compensation, and other key details on running its business, allows these individuals to unfairly compete and to assist such competitors, such as CCM, to utilize this information in the marketplace and to tailor its own value proposition to directly counter any advantage which would have otherwise been afforded to OneTrust had its trade secrets been protected.").) Any additional details sought by Defendants can be revealed through discovery.

B. Misappropriation

"Under both the DTSA and the CUTSA, 'misappropriation' means either (1) the [a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means; or (2) the [d]isclosure or use of a trade secret of another without express or implied consent." Genasys, 638 F. Supp. 3d at 1151 (quoting Alta Devices, Inc. v. LG Electronics, Inc., 343 F. Supp. 3d 868, 882 (N.D. Cal. 2018)). "Courts distinguish between direct trade secret misappropriation claims and indirect trade secret misappropriation claims, depending on whether a plaintiff alleges that a defendant obtained the trade secrets directly from the plaintiff or indirectly from someone other than plaintiff." Navigation Holdings, 445 F. Supp. 3d at 78. Plaintiff's only claim of direct misappropriation is alleged against Defendant Lassig. By contrast, Plaintiff asserts that

Defendants Ruby, Core, Leonardt, and CCM each indirectly misappropriated Plaintiff's trade secrets through either Lassig or Ruby. Defendants Ruby, Core, Leonardt, and CCM each argue that Plaintiff fails to adequately allege indirect misappropriation. (Doc. No. 27-1 at 8–12; Doc. No. 34-1 at 8–10; Doc. No. 44 at 2–3.)

To state a claim for indirect trade secret misappropriation, a plaintiff must show that defendant either "(a) knew or had reason to know before the use or disclosure that the information was a trade secret and knew or had reason to know that the disclosing party had acquired it through improper means or was breaching a duty of confidentiality by disclosing it; or (b) knew or had reason to know it was a trade secret and that the disclosure was a mistake." Id. at 79 (quoting Cal. Police Activities League v. Val. Police Youth Charities, Inc., No. C 08-1991 PJH, 2009 WL 537091, at *3 (N.D. Cal. Mar. 3, 2009)). Here, Plaintiff's theory is that Ruby, though his position as coach and owner of Core, required Lassig to provide Core with Plaintiff's trade secrets, and then provided the trade secrets to Leonhardt and CCM to assist CCM in its recruitment and retention of mortgage professionals and harm Plaintiff's business. (Doc. No. 16, SAC ¶¶ 101-09.)

Defendants first argue that Ruby and Core did not acquire any of Plaintiff's confidential information because "Lassig did not share OneTrust's P&Ls with Core; rather, at most, he input his personal P&L information from his time at OneTrust into Core forms." (Doc. No. 27-1 at 9; see also Doc. No. 34-1 at 10.) The cited portion of Ruby's deposition testimony does not necessarily support this position. (See Doc. No. 28-1 at 97:2-99:22.) It merely shows that rather than simply sending Plaintiff's profits and loss statements to Ruby, Lassig would have manually transferred information from Plaintiff's profits and loss statements to a standardized form. (Id.) As such, the transcript does not contradict the factual allegations in the SAC, stating that Lassig shared Plaintiff's profits and loss statements. And the Court must accept those factual allegations in the SAC as true. See Los Angeles Lakers, 869 F.3d at 800.

Defendants next argue that even if Ruby received Plaintiff's trade secrets, the SAC fails to adequately allege that CCM knowingly acquired or used them. (Doc. No. 27 at 9–

12.) As this district has recognized, plaintiffs asserting trade secret claims "oftentimes will not have direct evidence of misappropriation, but rather only circumstantial evidence—even after discovery is completed." Yeiser Rsch. & Dev. LLC v. Teknor Apex Co., 281 F. Supp. 3d 1021, 1048 (S.D. Cal. 2017). While courts should not permit fishing expeditions, circumstantial allegations of misappropriation suffice if they are "enough to raise a right to relief above the speculative level." Id. (quoting Twombly, 550 U.S. at 555). The "knowledge" element of an indirect misappropriation claim is sufficiently alleged where the complaint pleads facts to substantiate knowledge. See Navigation Holdings, 445 F. Supp. 3d at 79 (dismissing indirect misappropriation claim where plaintiff's assertion was "devoid of any factual substantiation of [d]efendant's knowledge"); see also Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

The SAC contains more than "bare allegations" of Defendants' alleged misappropriation. Plaintiff's allegations include: Lassig's testimony that he provided information in the form of profits and loss statements to Ruby while employed by Plaintiff; Ruby's testimony that he reviewed and used the information from Lassig in his position as coach and owner of Core; Leonhardt's testimony that he at least considers CCM's profits and loss statements as confidential and that he knew Ruby and Core routinely reviewed their clients' profits and loss statements, which Plaintiff alleges are generally understood to reveal confidential data; Leonhardt's hiring and consulting relationship with Ruby; and Leonhardt's text messages stating that CCM is "priced better" and "it's a loss" that Plaintiff claims demonstrate knowledge of the information Lassig conveyed to Ruby. (Doc. No. 16, SAC ¶¶ 49–53, 73–74.) These allegations "are substantial enough to justify opening the door to discovery." See Yeiser, 281 F. Supp. 3d at 1049. Defendants' arguments that Ruby and CCM did not know that the profits and loss statements' information was confidential, that CCM could not have acquired the information from Ruby, and that Leonhardt's text messages do not show knowledge are improper at the motion to dismiss stage because they contest the factual allegations in the SAC, which the Court must accept as true. See Los

Angeles Lakers, 869 F.3d at 800. In sum, in the SAC, Plaintiff has pleaded sufficient facts of misappropriation and indirect misappropriation.

C. Timeliness

Defendants argue that Plaintiff's claims for trade secret misappropriation are time barred by the applicable statute of limitations. (Doc. No. 27-1 at 12; Doc. No. 33-1 at 12; Doc. No. 42 at 4–5; Doc. No. 44 at 3–4.) Under both the DTSA and CUTSA, trade secret claims must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. See 18 U.S.C. § 1836(d); Cal. Civ. Code § 3426.6. Plaintiff brought its trade secret claims against Defendants Lassig, Ruby, and Core on August 11, 2025. (See Doc. No. 1, Compl.) On October 14, 2025, Plaintiff moved to amend its Complaint to assert its trade secret and other claims against Defendants Leonhardt and CCM. (See Doc. No. 9, FAC.)

The SAC pleads contemporaneous discovery: July 2025 for the Ruby/Core profits and loss statements disclosures, (Doc. No. 16, SAC ¶ 82), and August 2025 for Leonhardt's text-message campaign. (Id. ¶¶ 82, 75.) But Defendants argue that Plaintiff was on inquiry notice years earlier, as demonstrated by (1) a September 8, 2022 Utah state court complaint filed by Plaintiff against Defendant Lassig, in which Plaintiff alleged that Leonhardt used information from Lassig as a means to retain employees that Plaintiff recruited; and (2) an August 10, 2022 Linkedin message exchange between Leonardt and Plaintiff's Chairman, Joshua Erskine, in which Leonardt accused Erskine of "flat out misrep[resenting]" what he is selling and costs. (Doc. No. 27-1 at 12; Doc. No. 44 at 3.) Plaintiff responds that dismissal is only proper where the running of the statute of limitations is apparent from the face of the complaint and that, in any case, continuing misappropriation renders its trade secret claims timely. (See Doc. No. 39 at 9–10.)

On a motion to dismiss, "[t]he Court need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). Here, documents incorporated by reference in the SAC suggest that Plaintiff had inquiry notice of misappropriation as of at

least September 8, 2022 – the date of the Utah state court complaint.[3] (See Doc. No. 28-4, RJN Ex. D.) In light of this, Plaintiff's claims for trade secret misappropriation against Defendants Leonhardt and CCM are barred by the applicable three-year statute of limitations for those claims. But the allegations in the Utah state court complete are insufficient to render Plaintiff's claims for trade secret misappropriation against Defendants Lassig, Core, and Ruby untimely.

Plaintiff argues that its trade misappropriation claims against Defendants Leonhardt and CCM are still timely because continuing misappropriation accrues with the most recent act. (Doc. No. 39 at 9–10 (citing 18 U.S.C. § 1839(5)(B).) In response, Defendants Leonhardt and CCM contend that the Court should reject Plaintiff's continuing misappropriation theory because the SAC does not allege any non-conclusory facts showing the CCM Defendants' continuing use or disclosure of Plaintiff's profits and loss statements. (Doc. No. 44 at 3.) The CCM Defendants are correct. There are no specific

---

[3] Pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of the Utah state court complaint and the allegations therein. See U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) ("[W]e 'may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.'"). But "the Court does not accept as true allegations in that state court complaint." Haas Automation, Inc. v. Steiner, 750 F. Supp. 3d 1107, 1115 (C.D. Cal. 2024) (citing Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 999 (9th Cir. 2018)).

In their motion, in an effort to demonstrate that Plaintiff's claims for trade secret misappropriation are untimely, Defendants Leonhardt and CCM also request that the Court take judicial notice of an August 2022 LinkedIn Exchange between Leonhardt and Erskine that is referenced in Leonhardt's deposition transcript. (Doc. No. 27-1 at 18 (citing Doc. No. 28-2, RJN Ex. B at 138); Doc. No. 44 at 3.) Although the Court can take judicial notice of the deposition transcript itself, see Robinson Rancheria, 971 F.2d at 248, the Court cannot take judicial notice of disputed facts within the transcript. See Khoja, 899 F.3d at 999 ("But a court cannot take judicial notice of disputed facts contained in such public records. . . . . Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."). As such, the Court cannot take judicial notice of the purported August 2022 LinkedIn Exchange.

factual allegations in the SAC stating that Defendants Leonhardt or CCM continued to use Plaintiff's trade secrets.

As such, the Court dismisses Plaintiff's claims for trade secret misappropriation under the CUTSA and under the DTSA against Defendants Leonhardt and CCM.[4] The dismissal of Plaintiff's trade secrets misappropriation claims against Defendants Leonhardt and CCM is with leave to amend. The Court declines to dismiss Plaintiff's claims for trade secret misappropriation against Defendants Lassig, Core, and Ruby.

**V. Plaintiff's Claim for Aiding and Abetting Misappropriation of Trade Secrets**

In the SAC, Plaintiff alleges a claim for aiding and abetting misappropriation of trade secrets under the DTSA against all Defendants except Lassig. (Doc. No. 16, SAC ¶¶ 156–61.) Defendants move to dismiss this claim on the ground that aiding and abetting is a common law claim not properly brought under the DTSA. (Doc. No. 27 at 12; Doc. No. 34-1 at 16–17; Doc. No. 43 at 6; Doc. No. 44 at 4.) Defendants are correct. "Aiding and abetting are common law claims separate from federal and state statutory trade secrets misappropriation claims." Bus. Sols., LLC v. Ganatra, No. SACV181426DOCKESX, 2019 WL 926351, at *7 (C.D. Cal. Jan. 7, 2019). And Plaintiff has not cited any section of the DTSA or any other federal statute providing for an aiding and abetting cause of action. As such, the claim is not cognizable, and it must be dismissed.

In response, Plaintiff contends that the Court should not dismiss the claim despite its caption because the allegations in the SAC sufficiently plead a claim for "direct" misappropriation under the DTSA. (See Doc. No. 39 at 10–11; Doc. No. 38 at 14–16.) In light of this, the Court dismisses Plaintiff's claim for aiding and abetting trade secret misappropriation and grants Plaintiff leave to amend the claim to state a claim for direct

---

[4] In their motions, Defendants Leonhardt and CCM argue that Plaintiff's trade secrets claim against them under the CUTSA preempts several of Plaintiff's other claims. (See Doc. No. 27-1 at 12–15.) Because the Court has dismissed Plaintiff's CUTSA claim against Defendants Leonhardt and CCM, the Court declines to address this additional argument at this time.

trade secret misappropriation under the DTSA.

**VI. Plaintiff's Claim for California Trade Libel**

In the SAC, Plaintiff alleges a claim for California trade libel against Defendants Ruby, Core, Leonhardt, and CCM. (Doc. No. 16, SAC ¶¶ 110-20.) As alleged against Defendants Leonhardt and CCM, the claim is based on statements by Leonhardt to Evans in text messages dated April and May 2022. (Id. at ¶ 115.) As alleged against Defendants Ruby and Core, the claim is based on statements by Ruby to Evans in voicemails dated April 2022. (Id. at ¶ 114.) Defendants Leonhardt and CCM move to dismiss the California trade libel claim on the grounds that the claim is time-barred by the applicable statute of limitations. (See Doc. No. 27 at 16–19; Doc. No. 44 at 6–7.)

According to the allegations in the SAC, the statements underlying Plaintiff's California trade libel claim were made in April and May 2022. (See Doc. No. 16, SAC ¶¶ 60–64, 67–74.) And Plaintiff does not dispute that its California trade libel claim is subject to California's two-year statute of limitations. (See Doc. No. 39 at 16–17.) As such, Plaintiff's California trade libel claim is time barred based on the face of the complaint.

Nonetheless, Plaintiff argues that its claim for California trade libel is not time barred because it is timely under California's discovery rule. (See id. at 16.) Under California law, the discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 807 (2005). "Reason to discover" a cause of action means that a plaintiff "has reason to at least suspect a factual basis for its elements.'" Id. (citation omitted) (explaining that courts "look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them"). A "plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury" and is charged with knowing the information that the investigation would have revealed. Id. at 808-09.

To invoke the discovery rule for an otherwise time-barred claim under California law, "a plaintiff whose complaint shows on its face that his claim would be barred without

the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." Id. at 808 (citation omitted) (emphasis removed); accord Malek Mansour v. Bos. Sci. Corp., No. 8:26-CV-01121-FWS-DFM, 2026 WL 2886772, at *3 (C.D. Cal. Sept. 25, 2026); Besweet Creations, Inc. v. Catalent Wellness California, LLC, No. 25-CV-06521-SK, 2026 WL 2161629, at *5 (N.D. Cal. July 27, 2026). "The plaintiff bears the burden of proving each element; 'conclusory allegations' will not suffice." Malek Mansour, 2026 WL 2886772, at *3 (quoting Fox, 35 Cal. 4th at 808). "In order to adequately allege facts supporting a theory of delayed discovery, the plaintiff must plead that, despite diligent investigation of the circumstances of the injury, he or she could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period." Fox, 35 Cal. 4th at 809.

Here, Plaintiff has failed to plead sufficient facts showing that the California discovery rule should apply here. Regarding Defendant Leonhardt's allegedly disparaging text messages, Plaintiff asserts that it initially discovered them in August 2025, but Plaintiff fails to allege why discovery could not have occurred earlier. (See Doc. No. 39 at 16.) The SAC alleges only that "OneTrust became aware of Leonhardt's disparaging and threatening remarks to Evans in August 2025, when Joshua Erskine, CEO of Warp Speed Holdings and Chairman of the Board for OneTrust reviewed the text messages which were included with Evans' discovery responses to OneTrust in another legal matter." (Doc. No. 16, SAC ¶ 75.) Without additional facts regarding when the discovery responses were produced and why Plaintiff could not have reviewed them earlier, Plaintiff has not adequately pled an inability to have made an earlier discovery despite its reasonable diligence. Additionally, other allegations in the SAC suggest that Plaintiff may have had reason to suspect that Leonhardt was spreading allegedly defamatory information about Plaintiff as early as May 2022. In the SAC, Plaintiff alleges that, in May 2022, Evans complained that CCM had attempted to recruit all of Plaintiff's loan officers, and Evans reported that CCM called all of his customers. (Id. ¶¶ 71–72.) Plaintiff does not explain why this complaining and

reporting would not have triggered its duty to investigate. Further, allegations in the September 8, 2022 Utah complaint suggest that Plaintiff was aware of Leonhart's purported lies by that time. (See Doc. No. 28-4, RJN Ex. D ¶ 49 ("Mr. Leonhart and Mr. Ruby have used Broch and Shan's disparaging remarks . . . to spread lies about OneTrust . . . .").) Plaintiff pleads no facts regarding any investigation or diligence of Defendant Leonhardt's messages. As such, Plaintiff has failed to properly allege that the discovery rule applies to Defendant Leonhardt's messages. See Fox, 35 Cal. 4th at 808–09.

Plaintiff also has failed to adequately plead sufficient facts showing that the California discovery rule should apply to Defendant Ruby's messages. In the SAC, Plaintiff does not allege when it first learned of Ruby's voicemails to Evans. (See generally Doc. No. 16, SAC.) Thus, Plaintiff's allegations are entirely insufficient to demonstrate an inability to make an earlier discovery despite reasonable diligence. Even if the Court assumes that Plaintiff first learned of the voicemails when Erskine reviewed Defendant Ruby's July 2023 deposition transcript two years after it was taken, (see Doc. No. 16, SAC ¶ 82), Plaintiff fails to adequately explain why discovery could not have occurred earlier given that the transcript is from July 2023. Further, allegations in the September 8, 2022 Utah complaint suggest that Plaintiff was aware of Ruby's purported lies by that time. (See Doc. No. 28-4, RJN Ex. D ¶ 49.) As such, Plaintiff has failed to properly allege that the discovery rule applies to Defendant Ruby's messages. See Fox, 35 Cal. 4th at 808–09.

In its opposition, Plaintiff asserts that if the discovery rule is inapplicable to its California trade libel claim, the continuing violation doctrine applies. (Doc. No. 39 at 16.) Under California law, the continuing violation doctrine applies when there are allegations of reasonably frequent and similar acts that "may, in a given case, justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period." Aryeh v. Canon Bus. Sols., Inc., 55 Cal. 4th 1185, 1198 (2013). To support its assertion of the continuing violation doctrine, Plaintiff notes that the SAC alleges that "such statements continue to the present day." (Doc. No. 16, SAC ¶ 114.) This allegation is a mere

conclusory statement unsupported by any actual factual allegations in the SAC, and, therefore, the Court need not accept it as true. See Iqbal, 556 U.S. at 663 (explaining that a Court need not accept as true "mere conclusory statements"). The only specific messages alleged in the SAC to support Plaintiff's California trade libel claim all took place in April and May 2022. As such, the SAC fails to allege any facts showing that the continuing violation doctrine could apply here.

In sum, the Court dismisses Plaintiff's claim for California trade libel as barred by the applicable statute of limitations.[5] The Court grants Plaintiff leave to amend this claim.

## VII. Plaintiff's Claims for Defamation Per Se and Injurious Falsehood/Trade Libel Under North Carolina Law and for violation of the UDTPA

In the SAC, Plaintiff alleges against Defendants Ruby and Core claims for: (1) defamation per se under North Carolina common law; (2) injurious falsehood/trade libel under North Carolina common law; and (3) violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1 et seq. (Doc. No. 16, SAC ¶¶ 121–38.) Defendants Ruby and Core argue that these three claims should be dismissed because the claims are based on non-actionable opinions. (Doc. No. 34-1 at 11–13; Doc. No. 43 at 3–5.)

Under North Carolina law, "'[i]n order to recover for defamation, a plaintiff must allege that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person.'" Craven v. Cope, 188 N.C. App. 814, 816 (2008) (quoting Boyce & Isley, PLLC v. Cooper, 153 N.C.App. 25, 29 (2002)). "'[T]he term defamation applies to the two distinct torts of libel

---

[5] Defendants Leonhardt and CCM also argue that Plaintiff's claim for California trade libel should be dismissed because Plaintiff fails to plead special damages. (Doc. No. 27-1 at 16–17; Doc. No. 44 at 5–6.) And Defendants Ruby and Core also argue that Plaintiff's claim for California trade libel claim should be dismissed because the underlying statements are non-actionable opinions. (See Doc. No. 34 at 10–13.) Because the Court dismisses Plaintiff's claim for California trade libel for the reasons above, the Court declines to address these additional grounds for dismissal of the claim.

and slander.'" Id.

Under North Carolina law, publications that are obviously defamatory are called libel per se. Id. "To be actionable, a defamatory statement must be false and must be communicated to a person or persons other than the person defamed." Id. at 817 (quoting Andrews v. Elliot, 109 N.C. App. 271, 274 (1993)). Further, "'[i]f a statement cannot reasonably be interpreted as stating actual facts about an individual, it cannot be the subject of a defamation suit. Rhetorical hyperbole and expressions of opinion not asserting provable facts are protected speech.'" Id. (quoting Daniels v. Metro Magazine Holding Co., L.L.C., 179 N.C. App. 533, 538 (2006)). "Whether a publication is one of the type that properly may be deemed libelous per se is a question of law to be decided initially by the trial court." Ellis v. N. Star Co., 326 N.C. 219, 224 (1990).

"Under North Carolina law, a consumer may bring a private cause of action against businesses who engage in unfair and deceptive trade practices." Dan King Plumbing Heating & Air Conditioning, LLC v. Harrison, 281 N.C. App. 312, 319 (2022) (citing N.C.G.S. § 75-1.1). "'In order to establish a violation of N.C.G.S. § 75-1.1, a plaintiff must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs.'" Id. (quoting Gray v. N. Carolina Ins. Underwriting Ass'n, 352 N.C. 61, 68 (2000)).

Under North Carolina law, "the mere expression of an opinion or belief, or more precisely a representation which is nothing more than the statement of an opinion, cannot constitute fraud." Myrtle Apartments, Inc. v. Lumbermen's Mut. Cas. Co., 258 N.C. 49, 52 (1962). "When a statement 'at most reflects puffery,' which cannot be proven true or false, there can be no 'actionable fraud' because there is no allegation of a material fact." Quidore v. All. Plastics, LLC, No. 19 CVS 23648, 2020 WL 7082566, at *4 (N.C. Super. Dec. 3, 2020).

In the SAC, Plaintiff relies on the following statements to support its claims under North Carolina law for defamation per se, trade libel, and violation of the UDTPA:

1) That OneTrust "didn't honor any of its agreements"; 2) That MLOs such

> as Evans, will not have a "good experience" because Lassig didn't have a good experience; 3) That OneTrust was "a broke little mortgage guy . . . . That couldn't do nothing"; 4) That choosing OneTrust was "a gigantic mistake"; 5) That, when considering OneTrust for employment, a top MLO such as Evans shouldn't be "looking at this kind of shit"; and 6) Other statements identified in this Complaint or that will be identified during the course of discovery that falsely described the quality, value, or integrity of OneTrust's business operations and financial practices.

(Doc. No. 16, SAC ¶¶ 122, 128, 134.)

The Court agrees with Defendants Ruby and Core that statements two through five in the above paragraph are non-actionable statements of opinions. In addition, the sixth statement consists of mere conclusory statements that the Court need not accept as true. See Iqbal, 556 U.S. at 663 (explaining that a Court need not accept as true "mere conclusory statements"). However, the first statement – that Plaintiff "didn't honor any of its agreements" – is a statement of fact rather than a statement of opinion.[6] As such, the Court declines to dismiss Plaintiff's claims under North Carolina law for defamation per se, trade libel, and violation of the UDTPA to the extent they are based on the Ruby's alleged statement that Plaintiff allegedly "didn't honor any of its agreements."[7]

---

[6] Defendants Ruby and Core contend that this statement is non-actionable because the statement by Ruby was purportedly based on a prior statement by Lassig, and a disclosed-based opinion is non-actionable. (Doc. No. 27-1 at 4 (citing Standing Comm. on Discipline of U.S. Dist. Ct. for Cent. Dist. of California v. Yagman, 55 F.3d 1430, 1439 (9th Cir. 1995)).) This argument fails because there are no allegations in either the SAC or the Utah state court complaint stating that, when Defendant Ruby made this alleged statement to Evans, Ruby disclosed to Evans that the statement was based on an earlier statement made by Lassig. (See generally Doc. No. 16, SAC; Doc. No. 28-4, RJN Ex. D.)

[7] Defendants Ruby and Core also argue that Plaintiff's claim for violation of the UDTPA is preempted by Plaintiff's claim for trade secrets misappropriation under the CUTSA. (Doc. No. 34-1 at 14–16; Doc. No. 43 at 5–6.) Section 3426.7 of the California Uniform Trade Secrets Act "implicitly preempts alternative civil remedies based on trade secret misappropriation." K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc., 171 Cal. App. 4th 939, 954 (2009). "The statute's preemptive sweep is broad — it supersedes all claims premised on the wrongful taking and use of confidential and proprietary information, even if that information does not meet the statutory definition of

**VIII. Plaintiff's Claim for Injurious Falsehood/Trade Libel Under Ohio Law**

In the SAC, Plaintiff alleges a claim against Defendants Leonhardt and CCM for injurious falsehood and trade libel under Ohio common law. (Doc. No. 16, SAC ¶¶ 139–42.) Defendants Leonhardt and CCM argue that this claim should be dismissed because commercial falsehoods in Onio are litigated exclusively under the Ohio Deceptive Trade Practices Act. (Doc. No. 27-1 at 15; Doc. No. 44 at 4–5.) Defendants are correct. "Ohio has not recognized a separate tort of trade libel, but has instead dealt with all commercial falsehoods within R.C. 4165 the statutes governing Deceptive Trade Practices." Accelerated Moving & Storage v. Herc Rentals, Inc., 2022-Ohio-3016, ¶ 10 (10th Dist.); see also id. at ¶ 15 ("Accelerated's complaint actually asserts a species of 'commercially injurious falsehood' that is not currently recognized under Ohio law."). As such, Plaintiff's claim for injurious falsehood and trade libel under Ohio law is not actually cognizable under Ohio law. As a result, the Court dismisses Plaintiff's claim for injurious falsehood and trade libel under Ohio common law with prejudice.

/ / /

/ / /

---

a trade secret." VBS Distribution, Inc. v. Nutrivita Lab'ys, Inc., No. SA-CV-16-01553-CJC-DFM, 2020 WL 6259999, at *4 (C.D. Cal. Sept. 28, 2020) (citing Silvaco Data Sys. v. Intel Corp., 184 Cal. App. 4th 210, 239 n.22 (2010)). Therefore, any civil claims that are "'based on the same nucleus of facts as the misappropriation of trade secrets claim'" are preempted. K.C. Multimedia, 171 Cal. App. 4th at 958 (quoting Digital Envoy, Inc. v. Google, Inc., 370 F. Supp. 2d 1025, 1035 (N.D. Cal. 2005)); see also Deerpoint Grp., Inc. v. Agrigenix, LLC, 345 F. Supp. 3d 1207, 1236 (E.D. Cal. 2018) (explaining that CUTSA preemption occurs only "if there is no material distinction between the wrongdoing alleged under CUTSA and wrongdoing alleged under the civil claim").

As explained above, the Court permits Plaintiff's claim for violation of the UDTPA to proceed to the extent it is based on Defendant Ruby's alleged statement to Evans that Plaintiff "didn't honor any of its agreements." In contrast, Plaintiff's claim for trade secret misappropriation is based on Defendant Lassig allegedly conduct of providing profits and loss statements to Defendant Ruby. (See Doc. No. 16, SAC ¶¶ 49, 101–09.) As such, the two claims are not based on the same nucleus of facts, and, therefore, Plaintiff's UDTPA claim is not preempted by Plaintiff's CUTSA claim.

**IX. Plaintiff's Claims for Defamation Per Se Under Ohio Law and Violation of the Ohio DTPA**

In the SAC, Plaintiff alleges a claim for defamation per se under Ohio common law and a claim for violation of the Ohio Deceptive Trade Practices Act ("DTPA"), R.C. § 4165.02(A)(10) against Defendants Leonhardt and CCM. (Doc. No. 16, SAC ¶¶ 143–48.) Defendants Leonhardt and CCM argue that these two claims should be dismissed because they are both time barred by the applicable one-year statute of limitations for defamation claims. (Doc. No. 27-1 at 17 (citing Lasmer Indus., Inc. v. AM Gen., LLC, 741 F. Supp. 2d 829, 839 (S.D. Ohio 2010) ("Defamation claims are subject to a one-year statute of limitations under Ohio law")); Doc. No. 44 at 6–7.)

According to the allegations in the SAC, the statements underlying Plaintiff's claims for defamation per se under Ohio common law and for violation of the Ohio DTPA were made in April and May 2022. (See Doc. No. 16, SAC ¶¶ 67–74.) And Plaintiff does not dispute that these two claims are subject to Ohio's one-year statute of limitations. (See Doc. No. 39 at 15–16.) As such, Plaintiff's claims for defamation per se under Ohio common law and for violation of the Ohio DTPA are both time barred based on the face of the complaint.

Plaintiff argues, nevertheless, that these two claims are timely under the Ohio discovery rule. (See Doc. No. 39 at 15-16.) Defendants Leonhardt and CCM argue that the claims are time-barred because even if the discovery rule applies, Plaintiff fails to plead facts showing that it could not have made an earlier discovery with diligence. (See Doc. No. 27 at 17–19.) Defendants also argue that Plaintiff fails to show the statements were "secretive, concealed, or otherwise inherently unknowable" until Plaintiff allegedly discovered them in August 2025. (Doc. No. 44 at 6.) The Court agrees with Defendants.

Under the Ohio discovery rule, "'a cause of action does not arise until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, that he or she was injured by the wrongful conduct of the defendant.'" Weidman v. Hilderbrant, 178 Ohio St. 3d 3, 2024-Ohio-2931, ¶ 14 (quoting Norgard v. Brush Wellman, Inc., 95 Ohio

St. 3d 165, 2002-Ohio-2007, ¶ 8). The Ohio Supreme Court has held that the "discovery rule applies to claims of libel when the publication of the libelous statements was secretive, concealed, or otherwise inherently unknowable to the plaintiff due to the nature of the publication." See id. at ¶ 21. Under Weidman, private defamatory communications are "inherently not discoverable" until those communications are publicly disclosed. Id. at ¶ 20. But "when the defamed person gains knowledge of the defamatory statements within the statute-of-limitations period, the discovery rule is not applicable." Id. at ¶ 22. Weidman also does not relieve a plaintiff's obligation of diligence. Id. at ¶ 23 (applying the discovery rule to defamation claim where plaintiff alleged "that he did not know and could not have discovered, even with the exercise of due diligence, the allegedly defamatory statements made . . . and that he was not injured until they were disclosed to him"). The Weidman court simply reiterated the principle that "a plaintiff cannot be said to have slept on his rights when he was unaware that he was injured." Id. at ¶ 22 ("[E]quity aids the vigilant, not those who sleep on their rights."); see also Oliver v. Kaiser Cmty. Health Found., 5 Ohio St. 3d 111, 114 (1983) ("Use of the discovery rule eases the unconscionable result to innocent victims who by exercising even the highest degree of care could not have discovered the cited wrong.").

Plaintiff alleges that Leonhardt's disparaging text messages to Evans were inherently unknowable due to their private nature. (Doc. No. 39 at 15–16.) But the SAC alleges that at the time of the messages, Evans was an employee/agent of Plaintiff. (See Doc. No. 16, SAC ¶ 65.) Plaintiff fails to adequately explain why these messages should be deemed inherently unknowable when they were sent to one of its employees/agents. In particular, Plaintiff fails to explain why these messages are inherently unknowable when allegations in the SAC state that Evans complained and reported CCM's conduct to Plaintiff in May 2022. (See id. ¶¶ 71–72.)

Further, the SAC fails to specifically allege when the text messages at issue were turned over to Plaintiff. (See id. ¶ 75 (alleging only that "OneTrust became aware of Leonhardt's disparaging and threatening remarks to Evans in August 2025, when Joshua

Erskine, CEO of Warp Speed Holdings and Chairman of the Board for OneTrust reviewed the text messages which were included with Evans' discovery responses to OneTrust in another legal matter") In Weidman, the allegedly defamatory statement was in a private email communication that was not made available to the plaintiff until November 2020, one month before he filed suit. See 2024-Ohio-2931, ¶ 3. Here, the SAC alleges that the text messages were produced to Plaintiff on some unknown date but not reviewed until August 2025. This is insufficient to properly allege that the discovery rule should apply here. Further, allegations in the September 8, 2022 Utah complaint suggest that Plaintiff was aware of Leonhart's purported lies at that time. (See Doc. No. 28-4, RJN Ex. D ¶ 49 ("Mr. Leonhart and Mr. Ruby have used Broch and Shan's disparaging remarks . . . to spread lies about OneTrust . . . .").) As such, Plaintiff has not alleged sufficient facts showing either that the statements were "secretive, concealed, or otherwise inherently unknowable" until the relevant date, or that Plaintiff could not have discovered the statements, even with reasonable diligence. Weidman, 2024-Ohio-2931, ¶ 23; see also Gore v. Mohamod, 2022-Ohio-2227, ¶ 16 ("[W]here a statute of limitations problem is evident from the allegations in a complaint itself, the complaint in order to withstand a motion to dismiss must contain further allegations to suggest why the limitations bar does not apply.").

In sum, the Court dismisses Plaintiff's claim for defamation per se under Ohio common law and Plaintiff's claim for violation of the Ohio DTPA as barred by the applicable statute of limitations.[8] The Court grants Plaintiff leave to amend these two claims.

---

[8] Defendants Leonhardt and CCM also argue that these two claims should be dismissed because the statements at issue do not address the quality of Plaintiff's goods or services, and they also argue that Plaintiff's Ohio DTPA claim should be dismissed because the DTPA has no extraterritorial application. (Doc. No. 27-1 at 15–16; Doc. No. 44 at 5.) Because the Court dismisses Plaintiff's claims for defamation per se under Ohio common law and for violation of the Ohio DTPA as barred by the applicable statute of limitations, the Court declines to address these additional grounds for dismissal of the claims.

**X. Plaintiff's Claims for Tortious Interference With Contract and Tortious Interference With Business Relationship**

In the SAC, Plaintiff alleges a claims for tortious interference with contract and tortious interference with business relationship under Ohio common law against Defendants Leonhardt and CCM. (Doc. No. 16, SAC ¶¶ 162–71.) Under Ohio law, "'[t]he elements of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages.'" Couzens v. Union Bank & Tr. Co., 2024-Ohio-306, ¶ 14; accord Fred Siegel Co., L.P.A. v. Arter & Hadden, 85 Ohio St. 3d 171, 176 (1999).

"'To prevail on a claim for tortious interference with a business relationship, the plaintiff must show that the defendant intentionally and improperly interfered with the plaintiff[']s prospective business relations by either (1) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or (2) preventing the plaintiff from acquiring or continuing the prospective relation.'" Couzens, 2024-Ohio-306, ¶ 26. For either a tortious interference with a contract claim or a tortious interference with business relations claim, "the plaintiff must show that the alleged interference was without justification." Id.

Defendants Leonhardt and CCM argue that these two claims should be dismissed because the allegations in support of the claims are legal conclusion without the necessary operative facts to state a claim. (Doc. No. 27-1 at 23; Doc. No. 44 at 8–9.) Defendants are correct.

In the SAC, Plaintiff alleges that "[v]alid and enforceable contracts existed between OneTrust and its employees, including but not limited to Shan Lassig, Broch Lassig, Scott Evans and Valerie Contino, which contained confidentiality and non-solicitation provisions." (Doc. No. 16, SAC ¶ 163; see id. ¶ 170.) Plaintiff further alleges Defendants "intentionally procured breaches of these contracts by causing such employees to: (a) solicit OneTrust's employees to join CCM during and after their employment; (b) direct

OneTrust's borrowers to CCM; and (c) perform licensable and other mortgage related activities for CCM while still employed and sponsored by OneTrust; and (d) disclose OneTrust's confidential and trade secret information. (Id. ¶ 165; see id. ¶ 170.)

These are all mere conclusory allegations that the Court need not accept as true. See Iqbal, 556 U.S. at 663. The SAC does not contain any specific factual allegations explaining the specific contracts it had with those employees, what were the contents of the specific provisions at issue in those contracts, and how specifically those provisions were breached. And the SAC contains no specific factual allegations detailing the alleged interference misconduct that Defendants purportedly engaged in. For example, the SAC contains no specific factual allegations regarding Leonhardt and CCM's alleged soliciting of Plaintiff's employees or borrowers. Further, the SAC contains no specific allegations of any purported harm that occurred. As such, Plaintiff has failed to adequately state a claim for tortious interference with contract or a claim for tortious interference with business relations.

In sum, the Court dismisses Plaintiff's claim for tortious interference with contract and Plaintiff's claim for tortious interference with business relations.[9] The Court grants Plaintiff leave to amend these two claims.

**XI. Plaintiff's Claims For Violation of the Lanham Act, California's UCL, and Ohio's DTPA**

In the SAC, Plaintiff alleges against Defendants Leonhardt and CCM: (1) a claim for unfair competition under Lanham Act § 43(a), 15 U.S.C. § 1125(a); (2) a claim for unfair competition under California Business & Professions Code § 17200 ("UCL"); and

---

[9] Defendants Leonhardt and CCM argue that Plaintiff's claims for tortious interference with contract and for tortious interference with business relations should also be dismissed because the claims are defeated by the competitor privilege for at-will contracts. (Doc. No. 27-1 at 23–24; Doc. No. 44 at 9–10.) Because the Court dismisses Plaintiff's claims for tortious interference with contract and for tortious interference with business relations for the reasons above, the Court declines to address this additional ground for dismissal of the claims.

(3) a claim for deceptive trade practices under the Ohio Deceptive Trade Practices Act ("DTPA"), Ohio Revised Code § 4165.02. (Doc. No. 16, SAC ¶¶ 172–87.) Defendants Leonhardt and CCM argue that these three claims should be dismissed because these claims all sound in fraud, and Plaintiff has failed to satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading standard. (Doc. No. 27-1 at 19–20.)

Plaintiff's claims for unfair competition under the Lanham Act, for unfair competition under California's UCL, and for unfair competition under Ohio's DTPA are all based on allegations that Defendants Leonhardt and CCM falsely represented and promoted CCM as a compliant and law-abiding mortgage lender when it is not one. (Doc. No. 16, SAC ¶¶ 173, 178, 184.) Because these claims sound in fraud, Federal Rule of Civil Procedure 9(b) applies to all of them. See Fed. R. Civ. P. 9(b); see, e.g., Bobbleheads.com, LLC v. Wright Bros., Inc., 259 F. Supp. 3d 1087, 1095 (S.D. Cal. 2017) ("Rule 9(b) applies to Lanham Act claims that are grounded in fraud."); Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009) ("[W]e have specifically ruled that Rule 9(b)'s heightened pleading standards apply to claims for violations of the . . . UCL.").

Under Rule 9(b), a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy this heightened pleading standard, the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985). Thus, claims sounding in fraud must allege "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam) (internal quotations marks omitted). In other words, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003). "In addition, [t]he plaintiff must set forth what is false or misleading about a statement, and why it is false." Ebeid ex rel. U.S. v. Lungwitz, 616 F.3d 993, 998 (9th Cir.

2010) (internal quotations marks omitted).

Here, the fraudulent statement at issue is that Defendants Leonhardt and CCM purportedly represented and promoted CCM as a compliant and law-abiding mortgage lender when it is not one.[10] (Doc. No. 16, SAC ¶¶ 173, 178, 184.) These allegations are conclusory and insufficient to satisfy Rule 9(b)'s heightened pleading standard. Nowhere in the SAC does Plaintiff identify "when" or "where" these alleged compliant and law-abiding representations were made. Also, Plaintiff fails to adequately allege "how" these statements are false. In the SAC, Plaintiff asserts that the statements are false because Defendants Leonhardt and CCM are violating the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq*. (Id. ¶ 84.) But Plaintiff fails to plead sufficient facts to demonstrate violations of TILA by Defendants.

First, Plaintiff alleges that Defendants Leonhardt and CCM violated TILA's Loan Originator Compensation Rules because "CCM deceptively identifies the source or condition of loans in a manner that allows it to pay reduced compensation to its loan originators while retaining increased flexibility to manipulate pricing." (Id.) These are mere conclusory allegations that are insufficient to properly allege a violation of TILA. See Iqbal, 556 U.S. at 663 (explaining that a Court need not accept as true "mere conclusory statements). Plaintiff fails to provide any specific factual allegations in the SAC explaining how precisely CCM is allegedly deceptively identifying the source or conditions of its loans to manipulate pricing. Second, Plaintiff alleges that Defendants violated TILA by engaging in improper influence over underwriting because "CCM structures its operations so that underwriters report to, or are effectively managed by, sales leadership." (Doc. No.

---

[10] In its briefing, Plaintiff also asserts that these claims are also supported by CCM's self-description as "America's #1 Retail Mortgage Lender." (Doc. No. 39 at 17.) But that statement is a non-actionable puffery. See Hadley v. Kellogg Sales Co., 273 F. Supp. 3d 1052, 1081 (N.D. Cal. 2017) ("Generalized, vague, and unspecified assertions constitute 'mere puffery' upon which a reasonable consumer could not rely, and thus are not actionable under the [California] UCL . . . .").

16, SAC ¶ 84.) These also are mere conclusory allegations that are insufficient to properly allege a violation of TILA. See Iqbal, 556 U.S. at 663. In sum, Plaintiff has failed to satisfy Rule 9(b)'s heightened pleading standard for these three claims.

Plaintiff asserts that, with respect to its UCL claim, even if the claim is insufficiently pled under the fraudulent prong of the UCL, the claim is adequately pled under the unlawful and unfair prong of the UCL. (Doc. No. 39 at 18–19.) Plaintiff is wrong. To support its claim for violations of the unlawful and unfair prongs of the UCL, Plaintiff again relies on its allegations that Defendants Leonhardt and CCM violated TILA. But, as explained above, Plaintiff's TILA allegations are mere conclusory statements without sufficient factual support to properly allege violations of TILA. As such, Plaintiff has failed to adequately state a claim for violation of California's UCL under either the unlawful prong or the unfair prong as well as the fraudulent prong.

In sum, the Court dismisses Plaintiff's claims for unfair competition under the Lanham Act, for unfair competition under California's UCL, and for unfair competition under Ohio's DTPA.[11] The Court grants Plaintiff leave to amend these claims.

## X. Plaintiff's Claims for Civil Conspiracy and Unjust Enrichment

In the SAC, Plaintiff alleges against all Defendants a claim for civil conspiracy and a claim for unjust enrichment. (Doc. No. 16, SAC ¶¶ 188–200.) Unlike for Plaintiff's other claims where Plaintiff specifies whether the claim is being brought pursuant to federal, California, Ohio, or North Carolina law, for these two claims, Plaintiff does not

---

[11] Defendants Leonhardt and CCM also argue that Plaintiff's claims for unfair competition under the Lanham Act and Ohio's DTPA should be dismissed because Plaintiff fails to identify any specific commercial advertisement, and Plaintiff fails to adequately allege a competitive injury. (Doc. No. 27-1 at 20–21; Doc. No. 44 at 7.) Defendants Leonhardt and CCM also argue that the two claims are time barred by the applicable statute of limitations. (Doc. No. 27-1 at 22.) Because the Court dismisses Plaintiff's claims for unfair competition under the Lanham Act and Ohio's DTPA for the reasons above, the Court declines to address these additional grounds for dismissal of those claims.

specify the applicable state law for the claims. Indeed, in its briefing, Plaintiff refers to both Ohio law and California law when discussing these claims. (See, e.g., Doc. No. 39 at 21–22.) This is improper. See Stewart, 537 F. Supp. 3d at 1157 ("Plaintiffs must allege the applicable law to determine whether they plead a sufficient claim."); Moore, 740 F. Supp. 3d at 829 ("This Court and others in this District have repeatedly held that, due to variances among state laws, failure to allege which state law governs a common law claim is grounds for dismissal."). As such, the Court dismisses Plaintiff's claims for civil conspiracy and unjust enrichment.[12] The Court grants Plaintiff leave to amend these two claims to allege the applicable law governing the claims.

/ / /

/ / /

/ / /

---

[12] Defendants Leonhardt and CCM argue that Plaintiff's claims for civil conspiracy and unjust enrichment fail because the two claims fail under either California or Ohio law. (Doc. No. 27-1 at 25; Doc. No. 44 at 10.) Defendant Lassig contends that the two claims should be dismissed because the two claims are preempted by Plaintiff's CUTSA claim. (Doc. No. 33-1 at 22–25; Doc. No. 42 at 9–10.) Defendants Ruby and Core argue that Plaintiff's claim for unjust enrichment should be dismissed because the claim fails under either California or North Carolina law. (Doc. No. 34-1 at 17–19; Doc. No. 43 at 6.) Because the Court dismisses these two claims for the reasons above, the Court declines to address these additional grounds for dismissal.

**Conclusion**

For the reasons above, the Court grants in part and denies in part Defendants' motions to dismiss Plaintiff's second amended complaint. Specifically, the Court dismisses with prejudice Plaintiff's claim for injurious falsehood/trade libel under Ohio common law, and the Court dismisses with leave to amend: (1) Plaintiff's claim for trade secrets misappropriation under the CUTSA against Defendants Leonhardt and CCM only; (2) Plaintiff's claim for California trade libel; (3) Plaintiff's claim for defamation per se under Ohio common law; (4) Plaintiff's claim for violation of the Ohio DTPA; (5) Plaintiff's claim for misappropriation of trade secrets under the DTSA against Defendants Leonhardt and CCM only; (6) Plaintiff's claim for aiding and abetting misappropriation of trade secrets under the DTSA; (7) Plaintiff's claim for tortious interference with contract under Ohio common law; (8) Plaintiff's claim for tortious interference with business relations under Ohio common law; (9) Plaintiff's claim for unfair competition under the Lanham Act; (10) Plaintiff's claim for unfair competition under California's UCL; (11) Plaintiff's claim for unfair competition under Ohio's DTPA, (12) Plaintiff's claim for civil conspiracy, and (13) Plaintiff's claim for unjust enrichment. The Court declines to dismiss the remainder of the second amended complaint. Plaintiff must file its third amended complaint within **thirty (30) days from the date this order is filed.**

**IT IS SO ORDERED.**

DATED: October 19, 2026

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT